# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *Plaintiff*, | ) |
| v. | ) CASE NO.: CR-25-188-D |
| JERRY RAY BROWN, | ) |
| *Defendant*. | ) |

## MOTION TO SUPPRESS

Jerry Ray Brown moves this court to suppress evidence obtained in violation of the Fourth Amendment prohibition against unreasonable searches and seizures. A task force consisting of federal and local law enforcement warrantlessly searched a license plate-reader database (the Flock database) in Choctaw, Oklahoma, then used information gained from those searches of the Flock to track, stop, and arrest Mr. Brown. These warrantless searches qualified as a Fourth Amendment "search" because the searches violated Mr. Brown's reasonable expectation of privacy in the totality of his movements. And because the officers did not obtain a warrant, all evidence derived from these warrantless searches must be suppressed.

## BACKGROUND

### FLOCK SAFETY'S CAPABILITIES[1]

Flock Safety, Inc. is a private company that operates comprehensive surveillance

---

[1] The information contained in this section was obtained from the Flock Safety website at https://www.flocksafety.com.

1

systems around the United States, selling access to the surveillance systems and their accompanying data to law enforcement agencies and private entities. When implemented in a community, Flock is a comprehensive surveillance scheme, utilized by law enforcement with the intent to monitor the location and movements of potential criminal suspects. Flock Safety claims more than 5,000 communities have installed Flock's community-wide surveillance systems, and more than 3,000 law enforcement agencies have contracts to access the data produced by those systems.

Flock boasts "expansive coverage of connected communities, powered by public and private partnerships." This "holistic" system is, at its core, about increasing community surveillance: the technology provides law enforcement "more data and more opportunities to solve crime," granting its users "the power of intelligent evidence at scale." Flock aims not just to solve crime, but to "prevent," and "eliminate" it.

When a law enforcement agency signs a contract to work with Flock, they gain access to a "city-wide" surveillance scheme. Fixed cameras are installed on traffic light poles. These cameras automatically take photos of each vehicle that passes through one of the covered intersections. These cameras operate around the clock twenty-four hours a day, seven days a week, from the time they are installed. Every photo taken by these cameras is stored automatically in a "cloud-based" software system. Law enforcement have access to these photos and their accompanying data by accessing a computer and logging onto Flock's "dashboard." The Flock system stores all data collected by these cameras for 30 days.

Through their contract with Flock Safety, a law enforcement agency gains access

to the data collected by the Flock cameras installed in their jurisdiction. Flock's system also allows law enforcement agencies to sign inter-agency agreements to allow each agency access to the other agency's Flock data. Similarly, private communities like neighborhoods and businesses can also contract with Flock to install cameras for surveillance of parking lots, cul-de-sacs, and buildings. These private communities and businesses can also sign agreements allowing local law enforcement agencies to access the photos and accompanying data collected by their Flock cameras. Thus, while a law enforcement agency may start with access to data produced by their own cameras, law enforcement's access to data can expand as agencies contract with additional public and private Flock customers.

 The Flock system provides law enforcement customers with two types of data: Historical data and real-time alerts. To access historical data, a person can "[i]nput search terms such as vehicle color or type, license plate number (partial or full), day and time window into [Flock's] secure web portal. The searchable interface," Flock boasts, "makes it as easy to search for actionable evidence as it is to shop online." When a Flock system user searches for a vehicle, the system provides information about vehicles matching that vehicle's description that have been captured by Flock cameras in the preceding 30 days.

 In addition to historical data, the Flock system also provides real-time alerts to vehicles on the "Hot List." According to Flock's website, this "Hot List" is comprised of two parts: First, it integrates data from the Federal Bureau of Investigation's National Crime Information Center (NCIC), alerting local law enforcement when Flock cameras

identify vehicles placed on that list. Law enforcement can also make their own specialized, local "Hot List" of target vehicles. When one of those vehicles passes by a Flock camera, law enforcement receive a real-time notification about the location of that vehicle. Notably, only law enforcement users of Flock systems can integrate their systems with NCIC and receive real-time notifications of "wanted suspects" as they are identified by Flock cameras. From Flock's website:

Flock also advertises tools that elevate its surveillance systems above and beyond the average Automated License Plate Reader (ALPR). Law enforcement does not need a license plate number to search for, and find, a suspect vehicle when searching the Flock system, because the Flock database can "identify important details that traditional ALPR cameras overlook." Flock software distinguishes various types of vehicles from one another. Flock also gathers information and organizes it "based on a vehicle's physical description and unique features." According to its website, Flock's "unique Vehicle Fingerprint" technology allows users to filter searches of Flock footage based the following categories: (Make, Model, Color, Resident or non-resident vehicle, Timestamp, Type of plate (standard vs. temporary), Damage or alterations (i.e. broken taillight, after-market wheels)). The purpose of this surveillance is to assist law enforcement with the investigation and prosecution of alleged criminal conduct.

LAW ENFORCEMENT'S SEARCH OF THE FLOCK DATABASE IN THIS CASE

On March 30, 2025, Choctaw Police Department Officer Colten Lobb (Officer Lobb) notified Task Force Office Matthew Stephenson (TFO Stephenson) he believed he had a suspect in an attempted bank robbery that occurred at the FNB Bank in Choctaw,

4

Oklahoma. Officer Lobb advised that the suspect vehicle, a four door, silver Nissan Altima, had been observed on the Flock camera system. While the Flock system identified a vehicle matching that description in the Choctaw area, the vehicle was not registered to Mr. Brown. A search of the title information for the vehicle revealed the car was registered to P.B. who was identified as Mr. Brown's daughter. During the investigation, law enforcement was able to determine that Mr. Brown had two prior convictions for bank robberies in the Northern District of Oklahoma. TFO Stephenson utilized photos obtained from the Flock system to track the travel and location of the suspect vehicle and another vehicle registered to another member of Mr. Brown's family for over a two-week period. Mr. Brown was subsequently arrested on March 24, 2025.

On May 20, 2025, a federal grand jury returned a one-count indictment against Mr. Brown for attempted bank robbery (Doc. 19). Mr. Brown files this Motion to Suppress.

## ARGUMENT

The Fourth Amendment provides that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. U.S. Const. amend. IV. The "basic purpose of this Amendment. . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Carpenter v. United States*, 585 U.S. 296, 303 (2018). Evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure. *United States v. Calandra*, 414 U.S. 338, 347 (1974). If a search or seizure violates the Fourth Amendment, the "exclusionary rule" prohibits the admission of the "fruits" of illegally seized evidence, i.e., any information, object, or

testimony uncovered or obtained directly or indirectly as a result of the illegally seized evidence, or any leads obtained therefrom. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

When analyzing the constitutionality of a warrantless search, this Court engages in a three-step analysis. **First**, this Court determines whether the defendant has Fourth Amendment standing to challenge the search. *Byrd*, 584 U.S. at 403. A defendant has the burden to establish Fourth Amendment standing. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Davis*, 750 F.3d 1186, 1189 (10th Cir. 2014). **Second**, if the defendant has standing, this Court determines whether an unreasonable search occurred in violation of the Fourth Amendment. The government bears the burden to prove a challenged search was lawful. **Third**, if this Court determines that the warrantless search was unconstitutional, this Court then determines whether to suppress the challenged evidence. At this step, the defendant has the initial burden to establish "a factual nexus between the illegality and the challenged evidence." *United States v. Jarvi*, 537 F.3d 1256, 1260 (10th Cir. 2008) (quotation omitted). If this factual nexus exists, this Court suppresses the evidence under the Fourth Amendment's exclusionary rule unless the government establishes that an exception to the exclusionary rule applies. *United States v. Cotto*, 995 F.3d 786, 795 (10th Cir. 2021).

<u>MR. BROWN HAS STANDING TO CHALLENGE THE GOVERNMENT'S SEARCH BECAUSE HE HAS A REASONABLE EXPECTATION OF PRIVACY IN THE TOTALITY OF HIS MOVEMENTS</u>

Fourth Amendment standing is "the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an

6

unconstitutional search." *Byrd*, 584 U.S. at 410. The question "is whether the person claiming a constitutional violation 'has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge.'" *Id.* at 403. A defendant has the burden to establish Fourth Amendment standing. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978). A Fourth Amendment search occurs when, *inter alia*, the government violates a person's reasonable expectation of privacy. *Carpenter*, 585 U.S. at 306.

## THE FOURTH AMENDMENT, TECHNOLOGY, AND THE REASONABLE EXPECTATION OF PRIVACY

"As technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," Fourth Amendment jurisprudence expanded to "assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted.'" *Id.* (citing *Kyllo* v. *United States*, 533 U. S. 27, 34 (2001)). Supreme Court "cases have recognized some basic guideposts. First, that the [Fourth] Amendment seeks to secure 'the privacies of life' against 'arbitrary power.' Second, and relatedly, that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 585 U.S. at 305 (internal citations omitted). The Fourth Amendment's exclusionary rule is meant "to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Calandra*, 414 U.S. at 347. Thus, courts must adapt their understanding of Fourth Amendment protections as technological advancements change the nature of police surveillance, in order to disincentivize ever-expanding government intrusions into individuals' private lives.

The Supreme Court's Fourth Amendment jurisprudence reflects this adaptation. In 1982, *United States v. Knotts* introduced the question of whether "different constitutional principles would be applicable" if "twenty-four-hour surveillance of any citizen in this country [were] possible." *Carpenter*, 585 U.S. at 306-307, *citing United States v. Knotts*, 460 U.S. 276, 283-84 (1983).

Most recently, the Supreme Court held in *Carpenter* that the government's acquisition of cell-site location information (CSLI) to locate and track an individual was a Fourth Amendment search. *Carpenter*, 585 U.S. at 316-317. This was so even though the government obtained those records from a third-party service provider. *Id.* at 309-313. The Court compared CSLI to the GPS data in *Jones*, finding that the use of CSLI to track a person's movements for days at a time contravened that person's expectation of privacy in the totality of their movements. *Id.* at 310. The Court noted particular concern with the fact that cell phone location information is "detailed, encyclopedic, and effortlessly compiled," making it easy for the Government to track the whole of a person's movements. *Id.* at 309. The Court further held that the government violated the Fourth Amendment in that case because it acquired the CSLI records without a warrant. *Id.* at 316-320. Recognizing the potential for technologies like these to enable invasive surveillance on a mass scale, the Court has admonished lower courts to remain vigilant "to ensure that the 'progress of science' does not erode Fourth Amendment protections." *Carpenter*, 585 U.S. at 320.

## THE GOVERNMENT'S SEARCH OF THE FLOCK SYSTEM IS A FOURTH AMENDMENT "SEARCH"

Long-term location tracking through advanced technology intrudes upon the reasonable and widely-help expectation that the government "would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." *Jones*, 565 U.S. at 430. But that is essentially what Flock does. Like GPS data in *Jones*, and CSLI in *Carpenter*, Flock provides law enforcement with "detailed, encyclopedic, and effortlessly compiled" information about a person's movements. *Carpenter*, 585 U.S. at 309. Flock gives law enforcement the power to constantly log the movements of anyone within a vehicle on a major road in the city of Choctaw. Flock collects this information automatically, day or night, every day of the year. It is available to law enforcement anywhere they want, anytime they want, through a simple search function.

Because of the nature of Flock's "scalable" technology, this is just the baseline information Flock provides law enforcement about a person's movements. Through inter-agency and public-private partnerships, Flock's services can expand to provide law enforcement with information about a person's movements in other jurisdictions, or through private neighborhoods, parking lots, and even public places like shopping malls. Government use of this wide-spread, long-term surveillance system clearly implicates Mr. Brown's reasonable expectation of privacy in the totality of his movements and therefore constitutes a Fourth Amendment search.

Flock's surveillance system is similar to *Carpenter's* CSLI in four crucial ways: (1) Flock provides highly detailed data of a sensitive nature to law enforcement; (2) Flock produces and stores huge quantities of data; (3) Flock's surveillance is widespread and

indiscriminate; and (4) Flock's database allows law enforcement automatic and retrospective access to this data. We consider these factors in turn.

## QUALITY OF DATA

Much like CSLI data in *Carpenter*, the data gathered and provided to law enforcement by Flock "provides an intimate window into a person's life." *Carpenter*, 585 U.S. at 311. Using the Flock system, law enforcement can track a person's movements on any major road in town, at any time of day, on any day of the year. This information provides law enforcement with sensitive personal information about anyone within any car (including judges and lawyers): Where they live; where they work; what grocery store they shop at most often; what neighborhoods or parks they visit regularly; and what paths they take to get to each of these places. Even if law enforcement only has access to the baseline Flock surveillance of vehicles on major roads, this data provides a clear picture of the private details of *any* individual's life.

This data is more than just random points on a map. Flock's records create GPS coordinates and photographs, which together place vehicles at highly specific locations at specific times, locating anyone in a car with more precision than the cell phone data at issue in *Carpenter* or even the GPS tracker in *Jones*. See *id.* at 324 (CSLI accurate to within one-eighth to four square miles); *Jones*, 565 U.S. at 403 (GPS device accurate to within 50–100 feet); *supra* at pp. 5-6 (ALPR location data accurate to within 2-4 inches of the camera and within feet of the vehicle).

## QUANTITY OF DATA

Similarly to CSLI in *Carpenter*, Flock provides law enforcement with significant quantities of information about the communities surveilled by Flock cameras. Every time a government agent queries the Flock database, as Officer Lobb did in this case, they search the millions of records it contains. As a result, this is a search of long-term location data even though agents may only rely on a small number of records produced in response to their queries. *See Carpenter*, 138 S. Ct. at 2217 n.3 (period of location data accessed by government is "pertinent period" for determining whether a search occurred).

While other ALPRs require law enforcement to type in a license plate number to identify a target vehicle, Flock's tracking system scans images for qualities of a vehicle other than its license plate, then catalogs that information. In short, law enforcement can access the Flock database, search a car's make and model, and see any car of that make and model that has crossed in front of a Flock camera over the past 30 days. Flock claims that the system can even track and identify vehicles based on their dirt, dents, and decals. A person need not be driving a car to be tracked by Flock, as the system can identify and track vehicles like bicycles and golf carts.

INDISCRIMINATE COLLECTION OF DATA

An equally important factor in the *Carpenter* Court's decision was the recognition that cell phone tracking allows the government to track essentially any person at any time. "[T]his newfound tracking capacity runs against everyone," the Court wrote, and "[o]nly the few without cell phones could escape this tireless and absolute surveillance." *Id*. at 2218. The same is true of the Flock system. For the vast majority of Americans, the choice to drive on public streets is not a luxury; it is "indispensable to participation in modern

society." *Id*. at 2210. In many parts of the country, people have no choice but to drive themselves to work, a grocery store, doctor's office, place of worship, even in some cases to see a neighbor. Once people drive on the public roads or even park in a privately owned lot or in their own driveway, there is little they can do to avoid having their precise location tagged by an ALPR system and made accessible to law enforcement without any suspicion of wrongdoing.

## AUTOMATICALLY TRANSMITTED AND RETROSPECTIVE DATA

Finally, much like the collection of CSLI in *Carpenter*, Flock data is both automatically transmitted and retrospective. The data is automatically transmitted in two ways: First, Flock cameras automatically take photos of every car that passes through a protected intersection. The Flock system then automatically transmits those photos to the Flock database, which itemizes the data: Type of vehicle, make, model, color, license plate number, other identifying characteristics. Law enforcement agents themselves do not have to collect, transmit, or process this data—Flock's software makes it available for their review. And because it is stored on a database, this information is accessible to any law enforcement agent with a Flock database log-in, from any computer with access to the database.

Finally, the Court in Carpenter expressed particular concern with the retrospective access to information that CSLI provided to the government. *Carpenter*, 585 U.S. at 312. Flock allows for this same retrospective access to data. The government can now "travel back in time" to recreate a person's complete path of travel, giving law enforcement

"access to a category of information otherwise unknowable," "subject only to" Flock's retention policies. *Carpenter*, 585 U.S. at 312.

Fourth Amendment case law makes it clear that Mr. Brown has a reasonable expectation of privacy in the totality of his movements. The confluence of these factors—automated collection of detailed location data about a vast swath of the American population, with a system allowing for retrospective searches—is why the acquisition of information from a Flock database (and its search or review) is a "search" under the Fourth Amendment.

THE THIRD-PARTY SEARCH DOCTRINE SHOULD NOT
BE EXTENDED TO THE FLOCK DATABASE

The Court in *Carpenter* noted that under *Smith v. Maryland*, 442 U.S. 735 (1979), and *United States v. Miller*, 425 U.S. 435 (1976), individuals ordinarily do not have a reasonable expectation of privacy in business records that they voluntarily disclose to third parties or to the public at large. *Id.* at 315. However, the Court declined to extend *Smith* and *Miller* to the collection of CSLI because such an application would not be a "straightforward application of the third-party doctrine, but instead a significant extension of it to a distinct category of information," and would "fail[] to contend with the seismic shifts in digital technology that made possible the tracking" in *Carpenter*. *Id*.

For the same reasons, the third-party doctrine rule in *Smith* and *Miller* should not be extended to the collection of vehicle and travel data collected by Flock. While *Smith* and *Miller* deal with "limited types of personal information," a Flock search provides an "exhaustive chronicle of location information." *Id.* at 314. As discussed above, this

information is of a particularly sensitive personal nature, providing identifying personal, political, religious, and even romantic information to law enforcement. *Id.* Together, this information provides a "detailed chronicle of a person's physical presence compiled every day," and thus "implicates privacy concerns far beyond those considered in *Smith* and *Miller*. *Id*. at 315. And as the Court considered in *Carpenter*, this information is not voluntarily exposed to law enforcement. As discussed above, driving a vehicle is, for many "a pervasive and insistent part of daily life" that cannot be avoided. *Id.* at 315. Flock tracks a car occupants' movements automatically, with no notice to drivers or opportunity to opt out. There is no meaningful way to assure you are avoiding detection by Flock cameras, other than refusing to drive. For these reasons, the third-party doctrine as laid out in *Smith* and *Miller* should not by extended to the Flock database.

## THE ACQUISITION AND SEARCH OF FLOCK RECORDS REQUIRES A WARRANT

Because a Flock database offers the government detailed location data collection about a vast swath of the American population, then allows for easy, automated, and retrospective searches, the warrantless acquisition of Flock records (and the subsequent warrantless search of those records) by law enforcement to find evidence of criminal activity is per se unreasonable.

As the Supreme Court recently reiterated in *Carpenter*, warrantless searches "undertaken by law enforcement officials to discover evidence of criminal wrongdoing" are typically unreasonable absent limited and specific exceptions. 585 U.S. at 316 (citing

*Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995)). None of those exceptions apply here.

Here, unlike *Carpenter*, law enforcement did not seek or obtain *any* court process prior to searching the database. *See id.* at 317. It did not even obtain the data pursuant to a subpoena. *Id*. Alito, J. dissenting). Yet, as shown above, Flock data (and ALPR data in general) can be just as revealing as CSLI, and therefore individuals maintain a similar reasonable expectation of privacy in it. For this reason, Flock data should be subject to the same warrant requirement as CSLI. *See id*. at 320.

## FRUITS OF THIS WARRANTLESS SEARCH MUST BE SUPPRESSED

Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment is generally inadmissible at trial. *Calandra*, 414 U.S. at 347; *United States v. Knox*, 883 F.3d 1262, 1273 (10th Cir. 2018). The exclusionary rule applies so long as the defendant establishes "a factual nexus between the illegality and the challenged evidence." *Jarvi*, 537 F.3d at 1260. "This nexus need not be 'particularly tight.'" *United States v. Elmore*, 101 F.4th 1210, 1220 (10th Cir. 2024). The defendant "need only show that the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct. In other words, the evidence must be in some sense the product of illegal governmental activity." *Id.* at 1220 (internal quotations omitted).

## CONCLUSION

Mr. Brown has a reasonable expectation of privacy in the totality of his movements. Because the Flock database tracks those movements, Mr. Brown also has a reasonable expectation of privacy in the contents of the Flock database related to his movements. Thus,

the officers conducted a Fourth Amendment search when they acquired and searched the Flock database to track Mr. Brown's movements. And because the officers did not obtain a warrant before searching the Flock database, the warrantless searches violated the Fourth Amendment. This Court should suppress all fruits from this unconstitutional warrantless search, including the attempted bank robbery charged in Count One.

Respectfully Submitted,

*/s Traci L. Rhone*
TRACI L. RHONE, OBA No. 19285
ASSISTANT FEDERAL PUBLIC DEFENDER
OFFICE OF THE FEDERAL PUBLIC DEFENDER
WESTERN DISTRICT OF OKLAHOMA
215 Dean A. McGee   Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405-609-5930
Telefacsimile: 405-609-5932
Electronic Mail: Traci_Rhone@fd.org
Counsel for Jerry Ray Brown

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2025 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic filing to Dan Gridley, Assistant United States Attorney.

*/s Traci L. Rhone*
Traci L. Rhone